IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-586

No. COA21-182

Filed 2 November 2021

Johnston County, No. 18 JA 109

IN THE MATTER OF: A.W.

Appeal by respondents from orders entered 30 October 2020 and 10 November 2020 by Judge Jason H. Coats in Johnston County District Court. Heard in the Court of Appeals 5 October 2021.

> *Holland & O'Connor, PLLC, by Jennifer S. O'Connor, for petitioner-appellee Johnston County Department of Social Services.*
>
> *Kimberly Connor Benton for respondent-appellant mother.*
>
> *Benjamin J. Kull for respondent-appellant father.*
>
> *Mobley Law Office, P.A., by Marie H. Mobley, for guardian ad litem.*

TYSON, Judge.

¶ 1 Respondent-mother and Respondent-father, collectively "Respondents," appeal the trial court's order awarding permanent guardianship of their daughter to her foster parents. We vacate and remand.

## I. Factual and Procedural Background

¶ 2 Johnston County Department of Social Services ("JCDSS") became involved with A.W. ("Andrea"), and her family after law enforcement responded to a 911 call

to their home following an incident of domestic violence between Respondents in March 2018. *See* N.C. R. App. P. 42(b) (pseudonym used to protect the identity of the juvenile). JCDSS alleged Respondent-father had assaulted Respondent-mother by attempting to stab her with a steak knife in February 2018 while ten-month-old Andrea and her stepsiblings were present. JCDSS implemented a safety assessment plan at this time. Respondent-father was arrested and charged. This charge was later dismissed.

On 24 April 2018, JCDSS removed Andrea and her stepsiblings from the home due to alleged violations of the safety plan by Respondent-father. One month later, JCDSS removed Andrea and her stepsiblings from the temporary safety provider's home. Respondent-father had refused to leave, which triggered a police escort of him from the property. Andrea and her stepsiblings were placed with the stepsiblings' father in South Carolina on 27 May 2018.

JCDSS filed its juvenile petition alleging neglect and dependency on 29 May 2018 after Respondents had removed Andrea from the placement in South Carolina and secreted Andrea's whereabouts for two days. Respondents returned Andrea to JCDSS' care the same day. Andrea was placed into a nonfamily-member-licensed foster care where she has remained for the pendency of this case.

The adjudication hearing was held on 27 June 2018. The court issued its order adjudicating Andrea as neglected and dependent on 6 December 2018. The order

contains 20 findings of fact and indicates, "parents by and through counsel, consent to an Adjudication of neglect and dependency based upon the foregoing findings of fact."

¶ 6 The trial court's disposition order was entered 6 February 2019 and continued Andrea in JCDSS' legal custody. The court ordered Respondents to cooperate with JCDSS and for JCDSS to continue to work towards reunification. In its permanency planning order filed 6 March 2019, the court ordered the primary permanent plan to be reunification with the parents, with a secondary plan of custody or guardianship with an approved caregiver.

¶ 7 In January 2019, the parents engaged in an argument during which Respondent-father allegedly struck Respondent-mother repeatedly. Law enforcement officers responded. Respondent-mother sought a Domestic Violence Protective Order ("DVPO"), alerted JCDSS, provided photos of her injuries, and copies of text messages and other social media posts sent by Respondent-father. Respondent-mother subsequently voluntarily dismissed the DVPO and reunited with Respondent-father. Since January 2019, no other incidents of domestic violence between Respondent-mother and Respondent-father have been reported.

¶ 8 Prior to the permanency planning hearing that is the subject of this appeal, and at the outset to the hearing, Respondent-father moved for the trial judge recuse himself based upon the trial judge's relationship with Andrea's foster father and

proposed guardian. The proposed guardian is a Johnston County Sheriff's deputy and serves as a bailiff in the county courthouse. Respondent-father also moved the court to delay the disposition hearing on Andrea until after an adjudication hearing was held on her younger brother, G.W., who was born after the present case began. The trial court denied both oral motions.

The court determined JCDSS would be relieved of reunification efforts, the permanent plan of guardianship had been achieved and ordered further reviews be suspended. On 30 October 2020, the court issued a permanency planning order awarding guardianship to Andrea's foster parents. Respondents appeal.

## II. Jurisdiction

Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. § 7B-1001(a) (2019).

## III. Analysis

On appeal, both parents filed separate briefs and arguments. Both argue the trial court failed to make the required findings to support ceasing reunification and that they were either unfit or had acted inconsistently with their constitutionally protected status as parents before granting guardianship to nonfamily members or nonparents and waiving further court review. We agree.

### A. Constitutionally Protected Status

### *1. Standard of Review*

"Our review of whether conduct constitutes conduct inconsistent with the

parents' constitutionally protected status is *de novo*. Under this review, we consider the matter anew and freely substitute our judgment for that of the lower tribunal." *In re D.A.*, 258 N.C. App. 247, 249, 811 S.E.2d 729, 731 (2018) (alterations, citations and internal quotation marks omitted).

¶ 13        This Court has mandated that the trial court "must clearly address whether the parent is unfit or if their conduct has been inconsistent with their constitutionally protected status as a parent" prior to considering granting custody or a guardianship to a nonparent. *In re N.Z.B.*, __ N.C. App. __, __, __ S.E.2d __, __, 2021-NCCOA-345, ¶ 19.

## *2. Parental Fitness*

¶ 14        Respondents argue the trial court's finding that they were not fit and proper parents was not supported by clear, cogent, and convincing evidence and violated their constitutional rights to parent.

¶ 15        Our Supreme Court has repeatedly "recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66, 147 L. Ed. 2d 49, 57 (2000) (citations omitted). The Supreme Court of North Carolina has also recognized the parents' "constitutionally-protected paramount right to custody, care, and control of their child." *Petersen v. Rogers*, 337 N.C. 397, 400, 445 S.E.2d 901, 903 (1994).

¶ 16        The Supreme Court of North Carolina has held, "a natural parent may lose his

constitutionally protected right to the control of his children in one of two ways: (1) by a finding of unfitness of the natural parent, or (2) where the natural parent's conduct is inconsistent with his or her constitutionally protected status." *David N. v. Jason N.*, 359 N.C. 303, 307, 608 S.E.2d 751, 753 (2005). "[T]he decision to remove a child from the custody of a natural parent must not be lightly undertaken. Accordingly, a trial court's determination that a parent's conduct is inconsistent with his or her constitutionally protected status must be supported by clear and convincing evidence." *Adams v. Tessener*, 354 N.C. 57, 63, 550 S.E.2d 499, 503 (2001) (citation omitted).

¶ 17     No "bright line" exists beyond which the parents' conduct amounts to unfitness or actions inconsistent with the parents' constitutionally protected paramount status. *Boseman v. Jarrell*, 364 N.C. 537, 549, 704 S.E.2d 494, 503 (2010). "Determining whether a parent has forfeited their constitutionally protected status is a fact specific inquiry. In making such a determination, the trial court must consider both the legal parent's conduct and his or her intentions *vis-à-vis* the child." *In re N.Z.B.*, __. N.C. App. at __, __ S.E.2d at __, ¶ 20 (citations and internal quotation marks omitted).

¶ 18     Here, the court's finding of fact 3f provides:

> f. The Court finds by clear, cogent, and convincing evidence that neither parent is a fit and proper parent. The Court finds that the parents are acting inconsistent with the child's health and welfare. Furthermore, the parents have not made themselves readily available to JCDSS or the

GAL program.

¶ 19 JCDSS and the guardian *ad litem* ("GAL") argue the above conclusory finding is supported by the trial court's findings of fact 3 a-e set forth in section B below. JCDSS and the GAL conflate the parties' arguments. The trial court's conclusion to cease reunification efforts does not satisfy the requirement that before a court may award permanent custody of a child to foster parents and waive further review, the court must determine whether the parents were either unfit or had acted inconsistently with their constitutionally protected status as parents. *David N.*, 359 N.C. at 307, 608 S.E.2d at 753.

¶ 20 In *D.A.*, the trial court as here, "awarded *de facto* permanent custody of D.A. to the foster parents and waived further review." *In re D.A.*, 258 N.C. App. at 250, 811 S.E.2d at 732. The trial court found:

> neither respondent parent has taken responsibility or provided a plausible explanation for the injuries that occurred to the juvenile while he was in their care. That while respondent father's charges were dismissed, and despite pleading guilty to the charges imposed upon her for harming her child, respondent mother continues to maintain that she did not inflict the juvenile's injuries, and this remains a barrier to reunification as the home remains an injurious environment.

*Id.* at 251, 811 S.E.2d at 732.

¶ 21 This Court held "the trial court's findings [were] insufficient to support a conclusion that Respondent-father was unfit or had acted inconsistently with his

constitutionally protected status as a parent." *Id.*

¶ 22        Here, the trial court's order has very few findings of fact, mostly addressing the parties' history of domestic violence. Although the trial court found "there has not been any reports of domestic violence since the last hearing," and that the parties "have completed and/or are participating in services," the trial court also focused on the general characteristics of domestic violence and the fact that "both parents come from prior domestic violence relationships." The trial court states, "neither parent is fit or proper," but this assertion, whether a finding or a conclusion, is not based upon clear and convincing evidence of how either parent was presently "unfit" to exercise their constitutional right to parent Andrea. Further, the court's order contains no mention of how either parent acted inconsistently with their constitutionally protected status as parents. The court's findings must reflect how the parents were unfit or acted inconsistently "*vis-à-vis* the child." *In re N.Z.B.*, __. N.C. at __, __ S.E.2d at __.¶ 20.

¶ 23        JCDSS presented the testimony of four social workers who had been involved with the family during the pendency of the case. Juliet Hylton testified she had difficulty engaging the parents' therapists to determine how they were progressing in therapy and to determine their investment in the same. She speculated the parties had not fully acknowledged what had happened and could not move forward.

¶ 24        Deborah Ellis testified she had reviewed the notes from Respondent father's

therapy sessions and believed he continued to fail to accept responsibility for Andrea's removal, even after completing the required services on the case plan.

¶ 25        Susan Ahaus expressed concerns that the parents lacked true insight into what has occurred in their relationship and that they were just "checking the box." Ahaus pointed to Respondent-father "externalizing blame" and Respondent-mother stating the domestic violence was "all her fault." Ahaus acknowledged this was a "hard case" because the Respondents had been participating in their required services, and both parents were receiving therapy and couples' counseling.

¶ 26        Heidi Clay, who was the social worker for G.W.'s case, testified Respondents' home was outfitted with security cameras and she had concerns of power and control by Respondent father with regards to the cameras. No testimony showed any misuse of the security cameras whatsoever.

¶ 27        The record reflects absolutely no evidence that Respondents placed Andrea in harm's way after their argument that had prompted JCDSS' juvenile petition alleging neglect and dependency. No testimony showed her needs were ignored due to the parents' behaviors. No testimony showed their ongoing neglect or dependency of Andrea. Testimony showed their visitation with Andrea was positive and appropriate, and that she knew and had established bonds to her parents. The four social workers were not qualified as experts on domestic violence. Their lay beliefs that Respondents did not understand the seriousness of domestic violence is not clear,

cogent, or convincing evidence that the Respondents are unfit or had continued to engage in conduct inconsistent to parent Andrea, particularly considering the parents' full participation in services, the lack of any additional incidents, and the presence of another child in the home.

¶ 28    We also note that although there was a petition pending regarding the younger child at the time of the hearing, JCDSS dismissed that petition prior to the entry of the order. Thus, when the trial court entered the order, there was no petition concerning the younger child, who had lived with the parents since birth. The trial court's findings that "JCDSS is involved with that minor child and a juvenile petition is pending" is thus not supported by the record. The order does not explain how the Respondents can be fit and proper parents for the younger child but not for Andrea. No evidence tends to show either child had unique needs or circumstances which would render the Respondents unfit to have custody of one child but fit to have custody of the other child. The only basis for the trial court's determination was the existence of a prior history of domestic violence in the home, and prior domestic violence would have the same effect on any child in the home.

¶ 29    The trial court's insistence for Respondents to admit blame to prevent ceasing reunification efforts has no lawful basis without the threshold finding of unfitness or conduct inconsistent with their constitutionally protected status as parents. "[A] finding that a parent is unfit or acted inconsistent with his or her constitutionally

protected status is nevertheless required, even when a juvenile has previously been adjudicated neglected and dependent." *In re R.P.*, 252 N.C. App. 301, 304, 798 S.E.2d 428, 430 (2017).

¶ 30        Nothing in the trial court's permanency planning order or its the rulings pronounced in open court supports the trial court's conclusory finding that the biological parents are unfit to parent Andrea or that their conduct is inconsistent with their constitutionally protected status. Absent such clear findings, based upon clear, cogent, and convincing evidence, demonstrating how Respondents are unfit or acted inconsistently with their constitutionally protected status, the trial court erred in awarding guardianship of Andrea to the foster parents.

## B. Ceasing Reunification Efforts

¶ 31        Respondents contend the trial court erred when it ceased reunification efforts because its findings of fact supporting ceasing efforts were not supported by the evidence.

### 1. Standard of Review

¶ 32        "This Court reviews an order that ceases reunification efforts to determine whether the trial court made appropriate findings, whether the findings are based upon credible evidence, whether the findings of fact support the trial court's conclusions, and whether the trial court abused its discretion with respect to disposition." *In re P.T.W.*, 250 N.C. App. 589, 594, 794 S.E.2d 843, 848 (2016)

(citations omitted).

## 2. N.C. Gen. Stat. § 7B-906.2

Before a trial court may cease reunification efforts following any permanency planning hearing, it shall "make[] written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety." N.C. Gen. Stat. § 7B-906.2(b) (2019). To demonstrate efforts would be unsuccessful or contrary with the juvenile's well-being, the trial court is mandated to make written findings as to each of the following:

> (1) Whether the parent is making adequate progress within a reasonable period of time under the plan.
>
> (2) Whether the parent is actively participating in or cooperating with the plan, the department, and the guardian ad litem for the juvenile.
>
> (3) Whether the parent remains available to the court, the department, and the guardian ad litem for the juvenile.
>
> (4) Whether the parent is acting in a manner inconsistent with the health or safety of the juvenile.

N.C. Gen. Stat. § 7B-906.2(d) (2019).

With regard to its determination regarding reasonable efforts, the trial court made the following findings:

> It is futile and inconsistent with the juvenile's health, safety, and need for a permanent home within a reasonable period of time because: the Court finds that although the parents have completed and/or are participating in

services, they cannot provide a home free of safety and protective issues. The Court acknowledges that the mother has given birth to another child since the last hearing and that child remains in the home of the parents; however, the Court finds that JCDSS is involved with that minor child and a juvenile petition is pending.

. . .

a. The Court finds that both parents continue to be inconsistent with their testimony concerning the domestic violence history in their relationship. While [Respondents] will in one moment acknowledge domestic violence in their relationship, they will thereafter deny the particular events previously found to have occurred by this Court. Additionally, the parents will indicate that they have a better understanding of domestic violence and their relationship, have not been able to fully articulate the same.

b. The parents had been engaged in individual and couples counseling but have been discharged from the same as the practice does not wish to participate in legal actions. The parents have completed most of the services on their case plan; however, it was more of an action of "checking boxes" versus showing a change in behavior.

c. The parents continue to lack an insight into the seriousness of this matter and the past domestic violence. The parents, particularly the father, continue to externalize blame, especially towards JCDSS. Both parents come from prior domestic violence relationships. The Court finds that [Respondent-father] continues, with his therapist and other service providers, including JCDSS and this court, to attempt to rewrite the history.

d. The Court recognizes that a characteristic of domestic violence is the attempt to gain or maintain control over the other individual and the situation. In this case, the Court heard from four separate social workers who have had

previous and current involvement with the parents concerning not only this child but the newest child, and all of the social workers expressed concerns regarding the ongoing controlling behavior of [Respondent-father]. [Respondent-father] continues to dominate conversations and situations, and further responds to questions that are addressed to [Respondent-mother] and she allows the same. [Respondent-father] continues to attempt to exert power and control over the various social workers with JCDSS. JCDSS has had repeated difficulty in attempting to meet with [Respondent-mother], separate and apart from [Respondent-father]. Although [Respondent-father] is not in the home, he monitors and controls the doorbell camera in the home to address visitors that come to the residence, including but not limited to the social workers attempting to meet with [Respondent-mother] alone. Additionally, the home has cameras inside the residence as well.

e. The Court recognizes that there has not been any reports of domestic violence since the last hearing; however, the Court continues to express concern as to whether or not the parents would in fact contact outside authorities if domestic violence did occur as a result of JCDSS involvement in this case and the Court's prior orders. The Court finds from a review of the court file, that the parents have been found by the Court to not be truthful or forthcoming by prior orders.

¶ 35        As discussed above, the district court's findings focused on the underlying issue in this case: domestic violence. Respondents consented to the initial adjudication of Andrea as neglected and dependent based upon domestic violence in the home. It is undisputed that the Respondents both engaged in services aimed toward addressing their history of domestic violence. JCDSS acknowledged there had been no reports

of any new domestic violence incidents between the parents in 580 days at the time of the permanency planning hearing. JCDSS and the court were aware of G.W.'s birth and that JCDSS had allowed Respondents to take their infant son home from the hospital and to continue to live in their home.

¶ 36    JCDSS bears the burden of showing the futility of reunification efforts. As discussed above, JCDSS presented the testimony of four social workers. Not one single worker could identify a situation within the last twelve months where Respondents had engaged in domestic violence nor a situation where the police had to be called to respond or to break up an argument between the parties. No testimony contradicted Respondents' assertion that the security cameras were installed to provide home security and ability to monitor their newborn son, G.W.

¶ 37    Social worker Hylton's undisputed testimony was that Respondents had bonded with Andrea, that they loved her, that the visits went well and that they were engaged at visitations and continued to express their desire to be able to reunify with her and parent her. Hylton, who supervised the visits between Respondents and Andrea, testified she never saw anything in the visits that gave her any cause for concern.

¶ 38    The order contains no finding indicating the parents failed to make adequate progress within a reasonable period of time under the plan. The evidence presented shows the contrary, particularly considering JCDSS' dismissal of the petition

regarding the younger child, G.W., who had lived with Respondents since his birth.

¶ 39        The trial court's 23 October 2019 permanency planning order documents the last incidence of domestic violence between Respondents eight months earlier in January 2019 and finds the parents failed to take responsibility for their actions. At the permanency planning hearing subject of this appeal, held over a year later, both Respondents testified to what treatment they had completed and how that treatment had resulted in changes in their relationship.

¶ 40        Record evidence shows despite filing an initial petition to have G.W. adjudicated neglected, JCDSS did not remove him from Respondents' care. In fact, JCDSS reduced the perceived risks in the home to moderate and G.W. remained in Respondents' care. All parties acknowledged in their briefs that JCDSS dismissed the juvenile neglect petition concerning Andrea's sibling *a month before* the trial court entered its order here.

¶ 41        The trial court's insistence something more must be shown where Respondents have completed their case plan and where there have been no further allegations of domestic violence for more than a year is not clear, cogent, or convincing evidence to support the court's findings and conclusions. Here, hearings were significantly delayed due to COVID-19 related court closures and multiple continuances. During all that time, Respondents continued to remain engaged with JCDSS and Andrea. Respondents conceived a second child together. JCDSS began monitoring this child

from birth and allowed this child to remain in the home with Respondents. It is wholly inconsistent and inexplicable for an infant to be left in the care of Respondents, but for Andrea to remain in a placement with the foster parents.

¶ 42    To cease reunification, the trial court's findings must include not only finding a lack of reasonable progress, but a lack of participation or cooperation with the plan, JCDSS and GAL. *See* N.C. Gen. Stat. § 7B-906.2(d)(2). The court made no finding indicating Respondents had refused to meet with or cooperate with JCDSS or the GAL. Evidence before the court reflected that the therapists, not Respondents, had refused to provide information to JCDSS. Evidence showed Respondents attempted to mediate this, but JCDSS had refused. Undisputed evidence showed Respondent-father repeatedly emailed JCDSS seeking guidance on what else they needed to do to be reunited with their daughter.

¶ 43    The court found Respondents "have not made themselves readily available to JCDSS or the GAL program." In fact, all evidence, and the trial court's other findings, showed Respondents had attended court sessions, visitations, and had allowed home visits by JCDSS. Testimony and other evidence showed Respondents emailed and contacted JCDSS repeatedly. Further, no evidence presented showed DSS had difficulty meeting with Respondent-mother separate from Respondent-father. This finding is wholly unsupported by evidence in the record and is stricken.

¶ 44    The trial court failed to make statutorily required findings of fact related to

whether the parents demonstrated the degree of failure towards reunification necessary to support ceasing reunification efforts.

## IV. Respondent-mother's Separate Arguments on Appeal

¶ 45 Respondent-mother also challenges the trial court's failure to allow a continuance pending adjudication of G.W.'s petition, refusal to recuse itself and failure to verify the guardianship. Based upon our holdings, it is unnecessary to reach these issues.

## V. Conclusion

¶ 46 The trial court's order does not contain findings supported by clear, cogent, and convincing evidence to support the conclusion the parents were either unfit or had acted inconsistently with their constitutionally protected status as parents. Adequate findings do not support the conclusion to cease reunification efforts with Respondents. The court's order ceasing reunification efforts and awarding guardianship to nonparent foster parents is vacated. This matter is remanded for a prompt permanency planning hearing consistent with the parents' constitutionally protected rights to the care, custody, and control of their children and this opinion. *It is so ordered.*

VACATED AND REMANDED.

Chief Judge STROUD and Judge INMAN concur.