IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-890

Filed 21 May 2025

Carteret County, Nos. 19JT000062 20JT000008

IN RE: N.M.W. and A.N.D.

Appeal by respondents from orders entered 3 November 2023 and 30 May 2024 by Judge Andrew K. Wigmore in Carteret County District Court. Heard in the Court of Appeals 22 April 2025.

*Vitrano Law Offices, PLLC, by Sean P. Vitrano, for the respondent-appellant-Father.*

*Jason Senges, for the respondent-appellant-Mother.*

*Stephanie Sonzogni, for the petitioner-appellee Carteret County Department of Social Services.*

*Parker Poe Adams & Bernstein LLP, by Maya M. Engle, and Stephen V. Carey, for the Guardian ad Litem.*

TYSON, Judge.

Respondent-mother appeals from the district court's order ceasing reunification efforts with her daughters, A.N.D. ("Ann") born 2014, and N.M.W. ("Nora"). born 2020. Respondent-mother also appeals the termination of her parental rights to Ann. Respondent-mother and Respondent-father both appeal from the termination of parental rights to Nora. We affirm the order terminating Respondent-father's parental rights to Nora. We vacate the order ceasing Respondent-mother's

reunification efforts with daughters Ann and Nora, vacate the termination of Respondent-mother's parental rights to Ann and Nora, and remand for further statutorily-required findings and conclusions.

## I.    Background

Respondent-mother is the biological mother to R.J.D. ("Robert"), Ann and Nora. Robert lives with his paternal grandmother and is not involved in this process. Ann's biological father died in 2014. Respondent-mother and Respondent-father are parents of Nora.

Respondent-mother has interacted with child protective services since 2013 in three states: Maryland, Ohio, and North Carolina. The Carteret County Department of Health and Human Services ("DHHS") received three complaints about Ann's living conditions, allegations of domestic violence between Respondent-mother and Respondent-father, improper supervision, and sexualized and aggressive behavior by Ann.

The United States Coast Guard was patrolling the Morehead City Channel on 9 August 2019. The Guardsmen observed a sailing vessel, identified as the "Quest" with Maryland Vessel Registration 8909AH, impeding traffic operating in the channel. The Quest had dragged its anchor from its original position nearer the marsh and south of the Morehead City Marina. The Guardsmen observed Respondent-mother sitting in the open cockpit near the stern.

Respondent-mother was dressed in a grey shirt, blue jeans, and rubber boots.

She reported being fourteen weeks pregnant and Ann, her daughter, being aboard. Guardsmen observed approximately one foot of standing water inside the vessel's well, a large amount of live wires exiting storage compartments on the port and starboard sides entering the standing water inside the cabin, a heavy odor of diesel fuel emanating from the cabin, a large amount of garbage inside and outside of the cabin, and an extreme amount of filth located on the deck and inside the cabin. The Guardsmen encountered Ann on the bed inside the forward cabin. The Coast Guard removed the boarding party from the vessel, did not seek the source of the leaks, nor conduct a safety inspection.

Respondent-mother reported to the Guardsmen she resided on the vessel with Respondent-father and Ann. She also told the Guardsmen she and Ann were struggling to make ends meet, had nowhere else to go, and asserted she "was over living on the boat." The Guardsmen removed Respondent-mother and Ann from the vessel with her consent, transported them to the marina, and contacted the Morehead City Police Department for assistance to get them placed into a shelter.

DHHS filed a juvenile petition over a month later on 18 September 2019 alleging Ann to be neglected and dependent. Respondent-mother stipulated to the adjudication, which was entered by the district court on 13 December 2019.

The district court kept custody of Ann with DHHS and set concurrent plans of reunification as a primary plan and secondary plans of adoption and custody. Respondent-mother was ordered, *inter alia*, to maintain stability, find employment,

seek counseling, complete a parenting evaluation, follow the recommendations for mental health treatment, and seek domestic violence counseling.

Nora was born on 9 February 2020 and after Ann's disposition hearing. DHHS filed a juvenile petition for two-day-old Nora alleging she was a neglected and dependent juvenile and took the newborn into non secure custody. The juvenile petition made similar allegations contained in Ann's prior petition. Nora was adjudicated as a neglected and dependent juvenile on 10 September 2020. The district court established a primary plan for Nora of reunification with a secondary concurrent plan of adoption and custody.

Respondent-father of Nora was ordered, *inter alia*, to obtain mental health treatment for any diagnosis, remain sober and drug free, submit to drug tests, participate in a twelve-week substance abuse intensive outpatient program for three hours a day and attend three Alcoholics Anonymous/Narcotics Anonymous meetings per week, attend and complete parenting classes and show skills learned, complete a batterer's intervention program, and to refrain from domestic violence.

Respondent-mother received therapeutic services, completed a comprehensive clinical assessment. She also cleaned the boat and docked it at an appropriate location.

Both Respondent-mother and Respondent-father made progress on their respective plans. Respondent-mother and Respondent-father moved into a home in Onslow County. The district court adopted a plan of reunification with a secondary

concurrent plan of custody or guardianship and ordered a gradual reunification working toward a trial home placement in February 2021. Ann was returned to Respondent-mother and Respondent-father's home on 24 April 2021 and Nora was returned a month later on 28 May 2021.

Respondent-mother voluntarily placed both Ann and Nora with Nora's former foster parent on 4 July 2021. Respondent-mother alleged domestic violence by Respondent-father, but later recanted the allegations. Ann alleged sexual abuse by Respondent-father, which was investigated by Onslow County child protective services and was found to be unsubstantiated. The district court suspended the trial home placement and suspended Respondent-mother and Respondent-father's visitation with both their children on 23 July 2021.

Ann purportedly assaulted another child in the foster home, was involuntarily committed to Carteret Health Care, and was later placed in a therapeutic foster home. The district court amended the permanent plan of reunification with a concurrent plan of guardianship. The district court also ordered the home placement to remain suspended until Respondent-mother and Respondent-father had re-engaged in anger management, domestic violence, and couples counseling. Respondent-father was ordered to complete the domestic violence offender assessment with the STOP program and engaged in domestic violence offender and anger management group therapy.

Respondent-father was involuntarily discharged from a domestic violence

offender program, but he engaged with an online program. Respondent-mother and Respondent-father's home condition declined, with hazards present. Respondent-mother and Respondent-father were evicted from their home in July 2022 after live marijuana plants were found inside a shed located on the property.

The district court changed the plan to adoption with a concurrent secondary plan of reunification and suspended visitation on 16 September 2022. DHHS filed a petitions to terminate the mother's and father's parental rights to both juvenile on 1 December 2022. The district court ceased reunification efforts for both children on 21 April 2023 by an order entered six months later on 3 November 2023. Respondent-mother preserved her right of appeal.

Following hearings on 3 November 2023, 16 November 2023, and 12 January 2023, the trial court entered an order terminating Respondent-mother's parental rights to Ann and Respondent-mother and Respondent-father's rights to Nora. Respondent-mother and Respondent-father appeal.

## II.    Jurisdiction

Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. § 7A-27(b)(2) (2023).

## III.    Issues

Respondent-father argues the district court violated his right to counsel. Respondent-mother argues the district court failed to make the statutory findings required to cease reunification efforts and improperly set a sole plan of adoption.

## IV.    Respondent-father's appeal

Respondent-father argues he did not knowingly and voluntarily waive his right to counsel. Respondent-father asserts he had received no prior notice of his counsel's intent to withdraw.

## A. Standard of Review

Our Supreme Court has held:

> A trial court's determination concerning whether a parent has waived his or her right to counsel is a conclusion of law that must be made in light of the statutorily[-]prescribed criteria, so we review the question of whether the trial court erroneously determined that a parent [had] waived or forfeited his or her statutory right to counsel in a termination of parental rights proceeding using a *de novo* standard of review.

*In re K.M.W.*, 376 N.C. 195, 209-10, 851 S.E.2d 849, 860 (2020).

## B. Analysis

N.C. Gen. Stat. § 7B-1101.1(a) mandates parents to be represented by counsel during termination of parental rights actions, unless findings and supported conclusions show the parent has forfeited or waived such right. N.C. Gen. Stat. § 7B-1101.1(a) (2023).

After entering an appearance before the court, an attorney may not abandon a client and case without "(1) justifiable cause, (2) reasonable notice [to the client], and (3) the permission of the court." *Smith v. Bryant*, 264 N.C. 208, 211, 141 S.E.2d 303, 305 (1965) (citation omitted). "Where an attorney has given his client no prior notice of an intent to withdraw, the trial judge has no discretion. The Court must grant the

party affected a reasonable continuance or deny the attorney's motion for withdrawal." *Williams & Michael, P.A. v. Kennamer*, 71 N.C. App. 215, 217, 321 S.E.2d 514, 516 (1984).

A parent may waive representation by counsel if findings and conclusions support his actions constitute "egregious dilatory or abusive conduct." *In re K.M.W.*, 376 N.C. at 209, 851 S.E.2d at 860 (citation omitted).

Our Supreme Court explained in *K.M.W.*:

> In order to adequately protect a parent's due process rights in a termination of parental rights proceeding, the General Assembly has created a statutory right to counsel for parents involved in termination proceedings. More specifically, N.C.G.S. § 1101.1(a) provides that "[t]he parent [in a termination of parental proceeding] has the right to counsel, and to appointed counsel in cases of indigency, unless the parent waives the right." Although parents eligible for the appointment of counsel in termination of parental rights proceedings may waive their right to counsel, they are entitled to do so only "after the court examines the parent and makes findings of fact sufficient to show that the waiver is knowing and voluntary."

*Id.* at 208-09, 851 S.E.2d at 859.

Respondent-father was removed from a Batter's Intervention Program purportedly due to "threatening behaviors toward the GAL, the Social Worker and [Respondent-mother's] previous attorney." Respondent-father's first appointed attorney, Joshua Winks, moved for and was allowed to withdraw. Respondent-father's next appointed attorney, Elizabeth Ponder. also moved for and was allowed

to withdraw due to Respondent-father's purported harassment.

Respondent-father then waived the assistance of appointed counsel and proceeded *pro se*. Following DHHS's petition to terminate his parental rights to Nora, the trial court suggested appointing him counsel for the TPR proceeding. Respondent-father agreed and the court appointed attorney John Curtis, who also moved and was allowed to withdraw due to alleged irreconcilable differences.

Respondent-father requested yet another attorney, and Michael Barnhill was appointed by the court to represent him. The proceeding was delayed for almost three months to allow Barnhill to review the file, meet with Respondent-father, and prepare for the TPR proceeding.

Respondent-father never met with Barnhill. At the TPR proceeding on 3 November 2023 Barnhill moved to withdraw as counsel. Barnhill told the district court Respondent-father had purportedly verbally abused his staff to the point his assistant felt the need to call law enforcement officers, Respondent-father had left disparaging and aggressive voicemails for him and at the church' phone where Barnhill served as the pastor. Barnhill surmised Respondent-father either had or would perjure himself. Barnhill was allowed to withdraw.

The district court noted Respondent-father's actions and conduct appeared to be a stalling tactic:

> And that's a consent by the Respondent Parent that Barnhill will be allowed to withdraw, and he is ready to proceed without an attorney today. That all efforts to have

an attorney for [Respondent-father] have been made by the Court. There's been numerous attorneys through the years of the DSS case that have had to withdraw—have been allowed to withdraw; and although he represented himself through the DSS matter, we thought it necessary to make sure that he had court appointed attorney for the termination of parental rights matter; and he has basically forced two attorneys to withdraw in that matter and has asked to proceed on his own. The court is going to allow it.

The district court conducted a colloquy to determine if Respondent-father could proceed *pro se*. The district court also inquired of Respondent-father whether he wanted to proceed *pro se*, was prepared to proceed without counsel, and after affirmative responses had Respondent-father to execute a written waiver of counsel. Any issue in the attorney-client relationships resulted from Respondent-father's conduct. Respondent-father expressly consented to the withdrawal of Barnhill, executed a written waiver, and elected to proceed *pro se* for the second time.

The district court's findings show Respondent-father both voluntarily and knowingly waived his right to counsel. Presuming, without deciding Respondent-father did not knowingly and voluntarily waive his right to counsel, his multiple actions and conduct with multiple appointed counsels constituted a forfeiture of counsel. *See State v. Moore*, 290 N.C. 610, 893 S.E.2d 231, *appeal dismissed*, 385 N.C. 624, 895 S.E.2d 402 (2023). The district court noted Respondent-father's conduct had caused three of his prior appointed counsels to withdraw. The order terminating Respondent-father's parental rights to Nora is affirmed.

## V.    Respondent-mother's Appeal

Respondent-mother argues the district court failed to comply with the statutory mandate of N.C. Gen. Stat. § 7B-906.2 (2023), by failing to make the required findings to support a conclusion to allow it to discontinue and cease reunification efforts. *Id.*

## A. Standard of Review

This Court "reviews an order that ceases reunification efforts to determine whether the trial court made appropriate findings, whether the findings are based upon credible evidence, whether the findings of fact support the trial court's conclusions, and whether the trial court abused its discretion with respect to disposition." *In re D.A.*, 258 N.C. App. 247, 249, 811 S.E.2d 729, 731 (2018).

## B. Analysis

The General Assembly has mandated: "Reunification *shall remain a primary* or secondary plan unless the court made findings under G.S. 7B-901(c) or makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety." N.C. Gen. Stat. § 7B-906.2(b) (2023) (emphasis supplied).

Specific and supported evidentiary findings must show:

(1) Whether the parent is making adequate progress within a reasonable period of time under the plan

(2) Whether the parent is actively participating in or cooperating with the plan, the department, and the guardian ad litem for the juvenile.

(3) Whether the parent remains available to the court, the department, and the guardian ad litem for the juvenile.

(4) Whether the parent is acting in a manner inconsistent with the health or safety of the juvenile.

N.C. Gen. Stat. § 7B-906.2(d) (2023)

" Subsection . . . 906.2(d) requires written findings which shall demonstrate the degree of success or failure toward reunification. We therefore hold that only those factors which demonstrate the degree of success or failure toward reunification require written findings." *In re L.L.*, 386 N.C. 706, 716, 909 S.E.2d 151, 159 (2024). The trial court failed to find and make the statutory findings and supported conclusions of whether Respondent-mother had remained available to DHHS and the guardian *ad litem* for her children, whether she is acting in a manner inconsistent with her parental rights, and inconsistent with the health or safety of the juvenile, "which demonstrate the degree of success or failure toward reunification." *Id.* The orders of the district court ceasing reunification and terminating Respondent-mother's parental rights to Ann and Nora are vacated.

## VI. Conclusion

Respondent-father's right to counsel was not violated after he had expressly consented to his attorney's withdrawal due to his repeated egregious and dilatory behaviors and express waiver of counsel. The order terminating Respondent-father's parental rights to Nora is affirmed.

Statutorily-mandated findings "which demonstrate the degree of success or

failure toward reunification" do not support the district court's conclusion to cease reunification efforts with Respondent-mother. *Id.* The district court's order ceasing reunification efforts and order terminating Respondent-mother's parental rights to Ann and Nora are vacated.

Respondent-mother's case is remanded for a prompt permanency planning hearing consistent with the parent's constitutionally-protected rights to the care, custody, and control of her children and for DHHS to provide the statutorily-mandated efforts and services to assist her to reunify with her children. *It is so ordered.*

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

Judge HAMPSON concurs.

Judge STROUD concurs in part and dissents in part.

No. COA24-890 – *In re: N.M.W. & A.N.D.*

STROUD, Judge, concurring in part and dissenting in part.

I concur with the majority opinion affirming the Order terminating Father's parental rights. I dissent from the majority opinion as to Mother's appeal challenging the Permanency Planning Order and the Termination Order. I would affirm the trial court's order based on the many detailed findings of fact in both the Permanency Planning Order and the Termination Order, all of which are binding on appeal. *See In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019). It is apparent from these detailed orders that the trial court properly considered all the factors required under North Carolina General Statute Section 7B-906.2, even if the trial court did not "track the statutory language verbatim[.]" *See In re L.L.*, 386 N.C. 706, 716, 909 S.E.2d 151, 159 (2024) ("[T]he trial court's written findings need not track the statutory language verbatim, but they must make clear that the trial court considered the evidence in light of whether reunification would be clearly unsuccessful or would be inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time." (citation and quotation marks omitted)). The findings show that the trial court addressed "'the degree of success or failure toward reunification[,]'" *id.* (quoting N.C. Gen. Stat. § 7B-906.2(d)), and found that despite years of efforts by the Department of Social Services ("DSS") in North Carolina as well as two other states, there were "concern[s]" Mother was "just checking boxes on her case plan" to the extent she complied, but otherwise did not make any "real change."

Mother has raised no argument on appeal regarding the Termination Order but addresses only the Permanency Planning Order. Mother first argues that the trial court "failed to adhere to the statutory mandates by setting a sole plan of adoption and by failing to make the necessary findings to cease reunification efforts." She contends that under North Carolina General Statute Section 7B-906.2(b), concurrent plans are required "until a permanent plan is or has been achieved." N.C. Gen. Stat. § 7B-906.2(b) (2023). But she also acknowledges that if the Permanency Planning Order fails to include any required findings, we may consider both the Termination Order and the Permanency Planning Order together and any lack of findings in the Permanency Planning Order can be cured by the findings in the Termination Order. *See In re L.R.L.B.*, 377 N.C. 311, 320, 857 S.E.2d 105, 114 (2021) ("[W]hen reviewing an order that eliminates reunification from the permanent plan in conjunction with an order terminating parental rights pursuant to [North Carolina General Statute Section] 7B-1001(a1)(2), we consider both orders together as provided in [North Carolina General Statute Section] 7B-1001(a2). Based on this statutory directive, we concluded in *In re L.M.T.* that incomplete findings of fact in the cease reunification order may be cured by findings of fact in the termination order. Although [the] respondent-mother contends that a 2017 amendment to [North Carolina General Statute Section] 7B-1001 'abrogated' our ruling in *In re L.M.T.* on this issue, we find her argument unpersuasive." (quotation marks omitted) (citing *In re L.M.T.*, 367 N.C. 165, 170, 752 S.E.2d 453, 457 (2013))).

Mother argues that in the Permanency Planning Order, the trial court "failed to make necessary findings to cease reunification efforts[ ]" as required by North Carolina General Statute Section 7B-906.2(d), but her argument overlooks most of the trial court's other extensive and detailed findings in both the Permanency Planning Order and the Termination Order addressing each factor. Under the standard established by our Supreme Court in *In re L.L.*, the trial court's order is sufficient:

> At the outset, we reiterate this Court's previously articulated standard for written findings under the Juvenile Code. Specifically, the trial court's written findings need not track the statutory language verbatim, but they must make clear that the trial court considered the evidence in light of whether reunification would be clearly unsuccessful or would be inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time.
>
> Similarly, in keeping with this Court's approach under [North Carolina General Statute Sections] 7B-906.1(e) and 7B-1110(a), we recognize the Juvenile Code's flexibility for written findings that are responsive to each permanency-planning dispute. Subsection . . . 906.2(d) requires written findings which shall demonstrate the degree of success or failure toward reunification. We therefore hold that only those factors which demonstrate the degree of success or failure toward reunification require written findings.

386 N.C. at 716, 909 S.E.2d at 159 (citations and quotation marks omitted).

Mother challenges only one finding in the Permanency Planning Order as unsupported by the evidence, Finding of Fact No. 61, entitled "[e]fforts toward reunification." She challenges none of the other nearly nine pages of findings

3

regarding the grounds for termination of parental rights as unsupported by the evidence. Therefore, all of these unchallenged findings are binding on this Court. *See In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019) ("Findings of fact not challenged by [the] respondent are deemed supported by competent evidence and are binding on appeal." (citation omitted)). Mother argues Finding of Fact No. 61 does "not make clear the time frame of the efforts of the department and if they have been properly addressed since the last hearing." Finding of Fact No. 61 is supported by the evidence, and this finding summarizes a long series of actions DSS had taken to assist Mother in being able to reunify with her children over the years since they were taken into custody. In the context of the entire order, the time frame is clear; it covers the entire life of the case since Ann was first taken into custody and since Nora's birth. The trial court did not need to make a finding about the date of each action when the evidence clearly supports Finding of Fact No. 61 and the other findings in the Permanency Planning Order make it clear that the trial court addressed the factors under North Carolina General Statute Section 7B-906.2(d).

Mother acknowledges in her brief that the Termination Order "cures any defect with regards to [North Carolina General Statute Section 7B-]906.2(d)(1) and (2)." Thus, her argument remains only as to North Carolina General Statute Section 7B-906.2(d)(3), "[w]hether the parent remains available to the court, the department, and the guardian ad litem for the juvenile[,] and 7B-906.2(d)(4), "[w]hether the parent

is acting in a manner inconsistent with the health or safety of the juvenile." N.C. Gen. Stat. § 7B-906.2(d)(3)-(4).

The trial court's nearly nine pages of findings in the Permanency Planning Order do not use these exact words but the findings address both factors. Mother did not attend the permanency planning hearing and attended only the first two days of the three-day termination hearing. However, the findings overall show Mother had been available most of the time to DSS, the GAL, and the court, and she had engaged in some programs and classes over the years, but she failed to demonstrate that she learned anything from these programs. Mother's problem was not her availability; it was her persistent failure to benefit from the "near-continuous" services provided to her over a period of years. Her behaviors remained unchanged. The trial court found that "[g]iven the lack of progress in spite of the services provided, and that the parents have engaged in some services but no change is evident, reunification efforts at this point would be futile." The Termination Order includes even more findings addressing Mother's long history of assistance from DSS, her limited engagement, and her failure to benefit from these services. The Termination Order also includes extensive and detailed findings regarding the efforts of DSS in North Carolina as well as Maryland and Ohio before this case to address the same recurring issues arising from domestic violence and Mother's mental health concerns. Specifically, the trial court found "[t]he same behaviors" resulting in DSS involvement and removal of the children "remained through the case, and continued through this hearing." Mother

"made excuses, blamed others, and failed to take advantage of services in a meaningful way which would show change[ ]" in her behaviors. She was provided "opportunity after opportunity, as well as additional time to make change, and did not take advantage of it." The trial court found this lack of meaningful progress would not "allow[ ] reunification to occur." The trial court noted North Carolina is not the only state where there has been intervention by Child Protective Services ("CPS") but there have been "numerous interventions by CPS (in multiple states) as to [Ann]." "In spite of a myriad of near continuous services and treatment provided, the parents have been unable to remediate the issues that have led to DSS involvement." There is an "extensive [CPS] history in Maryland and Ohio dating back to 2013 with [Mother.]" The same issues with Mother arose in both Maryland and Ohio and remained at the time of the termination hearing.

Also, even if the trial court's findings in the Permanency Planning Order were insufficient, as the majority has determined, the Orders should not be vacated and remanded for a new hearing. At most, the Permanency Planning Order should be remanded for the trial court to make additional findings of fact. Mother has failed to demonstrate that "the trial court's error was material and prejudicial so as to warrant vacating and reversing the permanency planning order at issue and vacating the termination of parental rights order." *In re L.R.L.B.*, 377 N.C. at 326, 857 S.E.2d at 118. Even if the majority's analysis of the Permanency Planning Order is correct, the

6

Order should be remanded to the trial court to make additional findings, as explained

in detail by our Supreme Court in *In re L.R.L.B.*:

> We do not discern that the Legislature enacted [North Carolina General Statute Section] 7B-1001(a2) with the intention of disengaging an entire termination of parental rights process in the event that a trial court omits a single finding under [North Carolina General Statute Section] 7B-906.2(d)(1)–(4) from its trial court order which eliminates reunification from a child's permanent plan. Unlike the specific finding that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety which is required by [North Carolina General Statute Section] 7B-906.2(b) before eliminating reunification from the permanent plan, no particular finding under [North Carolina General Statute Section] 7B-906.2(d)(3) is required to support the trial court's decision. [North Carolina General Statute Section] 7B-906.2(d) merely requires the trial court to make written findings as to each of the issues enumerated in [North Carolina General Statute Section] 7B-906.2(d)(1)–(4), and to consider whether the issues demonstrate the parent's degree of success or failure toward reunification. A finding that the parent has remained available to the trial court and other parties under [North Carolina General Statute Section] 7B-906.2(d)(3) does not preclude the trial court from eliminating reunification from the permanent plan based on the other factors in [North Carolina General Statute Section] 7B-906.2(d). *Cf. In re R.D.*, 376 N.C. 244, 259, 852 S.E.2d 117 (2020) (concluding that the balancing of the six dispositional factors in [North Carolina General Statute Section] 7B-1110(a) "is uniquely reserved to the trial court and will not be disturbed by this Court on appeal").
>
> To obtain relief on appeal, an appellant must not only show error, but that the error was material and prejudicial, amounting to denial of a substantial right that will likely affect the outcome of an action. It is the trial court's authority as the finder of fact to assign weight to various

7

pieces of evidence . . . in exercising its discretion to determine[ ] that ceasing reunification is in the best interests of the child[.] Upon considering the trial court's order that eliminated reunification from the permanent plan together with its order terminating parental rights, and determining that the trial court's order eliminating reunification may be cured upon remand to the trial court . . . due to insufficient findings of fact contained in the order because it does not address the issue embodied in [North Carolina General Statute Section] 7B-906.2(d)(3) as to "whether the parent remains available to the court, the department, and the guardian ad litem for the juvenile," we conclude that [the] respondent-mother has not shown that the trial court's error was material and prejudicial so as to warrant vacating and reversing the permanency planning order at issue and vacating the termination of parental rights order.

*We therefore believe that the appropriate remedy for the trial court's error here is to remand this matter to the trial court for the entry of additional findings in contemplation of [North Carolina General Statute Section] 7B-906.2(d)(3). This Court's precedent . . . regarding the relationship between incomplete findings in an order which ceases reunification efforts and the findings of fact in a subsequent termination of parental rights order[ ] authorizes such a remedy. In the event that the trial court concludes, after making additional findings, that its decision to eliminate reunification from the juvenile[ ]'s permanent plan in its . . . permanency planning order was in error, then the trial court shall vacate said order as well as vacate the order terminating [the] respondent-mother's parental rights, enter a new permanent plan for the juvenile that includes reunification, and resume the permanency planning review process. If the trial court's additional findings under [North Carolina General Statute Section] 7B-906.2(d)(3) do not alter its finding under [North Carolina General Statute Section] 7B-906.2(b) that further reunification efforts are clearly futile or inconsistent with the juvenile's need for a safe, permanent home within a reasonable period of time, then the trial court may simply amend its permanency*

> *planning order to include the additional findings, and the . . . order terminating [the] respondent-mother's parental rights may remain undisturbed.*

*Id.* at 325-27, 857 S.E.2d at 117-18 (emphasis added) (citations, quotation marks, ellipsis, and brackets omitted).

Therefore, I concur in part with the majority opinion as to termination of Father's parental rights but otherwise dissent from the portion vacating the Permanency Planning Order and the Termination Order as to Mother. Both the trial court's Permanency Planning Order and Termination Order made extensive and detailed findings regarding Mother's lack of progress to remedy the behaviors leading to the removal of her children. In reading the findings of both orders together, as prescribed by our Supreme Court in *In re L.R.L.B.*, *see id.* at 320, 857 S.E.2d at 114, they are more than sufficient to support a conclusion to cease reunification efforts under North Carolina General Statute Section 7B-906.2. And even if the Permanency Planning Order is insufficient, this court should not vacate both orders but should remand to the trial court for additional findings as dictated by *In re L.R.L.B. See id.* at 325-27, 857 S.E.2d at 117-18.